# CILENTI & COOPER, PLLC

### ATTORNEYS AT LAW

60 East 42ⁿᵈ Street – 40ᵗʰ Floor

New York, New York 10165

_____

Telephone (212) 209-3933

Facsimile (212) 209-7102

October 13, 2022

**BY ECF**

Hon. James L. Cott, U.S.M.J
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

> *Re:* *Ramirez-Gonzalez v. AZK Restaurant, Inc., et al.*
> <u>*Case No. 22-CV-3091 (JLC)*</u>

Dear Judge Cott,

We are counsel to the plaintiff in the above-referenced matter, and jointly submit this letter together with defense counsel for the Court's assessment and approval of the settlement agreement ("Agreement") reached between the parties. The Agreement is being submitted contemporaneously herewith, and the parties respectfully request that the Court approve the Agreement because it represents a fair resolution of this dispute, which was negotiated at arm's length between experienced counsel.

### I.     The Need for the Court's Approval of the Agreement

As plaintiff's action arises under the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA"), the parties' settlement must be approved by this Court. *See Cheeks v. Freeport Pancake House, Inc.*, 796 F. 3d 199 (2d Cir. 2015). The FLSA expressly prohibits settlement of any right to unpaid minimum wages or overtime claims by employees made pursuant to 29 U.S.C. §§ 206-07, without the supervision of the Secretary of Labor. *See* 29 U.S.C. §216(c) (noting that a supervised settlement agreement "shall constitute a waiver by such employee of any right he may have [to pursue a private cause of action under FLSA]"). Courts have allowed an additional exception to the FLSA's restriction on settlement to include judicially supervised stipulated settlements. *See D.A. Schulte, Inc., v. Gangi*, 328 U.S. 108, 113 n.8 (1946); *Lynn's Food Stores, Inc. v. United States ex. Rel. U.S. Dept. of Labor*, 679 F.2d 1350 (11ᵗʰ Cir. 1982); *Sampaio v. Boulder Rock Creek Developers, Inc.,* No. 07 Civ. 153, 2007 U.S. Dist. LEXIS 66013 (E.D.N.Y. Sept. 6, 2007).

## II.     Plaintiff's Claims for Unpaid Wages

### a.     The Defendants

For over thirty (30) years, the defendants have owned and operated a restaurant doing business as "3 Guys Restaurant," located at 1381 Madison Avenue in Manhattan (the "Restaurant").

### b.     The Plaintiff

#### i.     Plaintiff's Jobs and Dates of Employment

Plaintiff is a former employee of the Restaurant, who was hired by the defendants in or about 2012 to work in both tipped and non-tipped capacities as a dishwasher, porter, stock person, and food delivery worker.[1] Except for the period when the Restaurant was closed due to the onset of the Covid-19 pandemic between in or about mid-March 2020 and in or about May 2020, plaintiff worked continuously for the defendants until his employment ended on or about April 4, 2022.

#### ii.     Plaintiff's Work Hours

From the beginning of the six (6) year limitations period in April 2016 and continuing through in or about December 2017, plaintiff alleges working six (6) days per week and, although his work shift fluctuated slightly each week, he contends that he typically worked eleven and one-half (11½) hours per day from 11:00 a.m. until 10:30 p.m.  Plaintiff was afforded a thirty (30) minute meal break each day, thereby working approximately sixty-six (66) compensable work hours each week.

Beginning in or about January 2018 and continuing through in or about mid-March 2020, plaintiff alleges working five (5) days per week and, although his work shift fluctuated slightly each week, he contends that he typically worked eleven and one-half (11½) hours per day from 11:00 a.m. until 10:30 p.m.  Plaintiff was afforded a thirty (30) minute meal break each day, thereby working approximately fifty-five (55) compensable work hours each week.

Upon returning to the Restaurant from the pandemic closure in or about June 2020 and continuing through in or about March 2021, plaintiff alleges working three (3) to four (4) days per week and, although his work shift fluctuated slightly each week, he contends that he typically worked eight (8) to nine (9) hours per day from 11:00 a.m. until 7:00 p.m. or 8:00 p.m., thereby working between twenty-four (24) to thirty-six (36) hours per week.

---

[1] Plaintiff alleges that neither at the time of hire, nor at any time thereafter, did the defendants provide plaintiff with a written wage notice identifying his regular hourly rate of pay and corresponding overtime rate of pay.

Beginning in or about April 2021 and continuing through the remainder of his employment on or about April 4, 2022, Plaintiff worked three (3) to four (4) days per week and, although his work shift fluctuated slightly each week, he typically worked ten (10) hours per day from 11:00 a.m. until 9:00 p.m., thereby working between thirty (30) to forty (40) hours per week.

### iii. Plaintiff's Pay

Plaintiff alleges being paid as follows:

- April 2016 - September 9, 2016:
  - $9 per hour for twenty (20) hours per week; $7.50 per hour for twenty (20) hours per week; and $13.50 per hour for seven (7) hours per hour week; $0 for nineteen (19) hours.

- September 10, 2016 – January 6, 2017:
  - $9 per hour for twenty (20) hours per week; $7.50 per hour for twenty (20) hours per week; and $13.50 per hour for nine (9) hours per hour week; $0 for seventeen (17) hours.

- January 7, 2017 – December 31, 2017:
  - $11 per hour for twenty (20) hours per week; $7.50 per hour for twenty (20) hours per week; and $16.50 per hour for nine (9) hours per hour week; $0 for seventeen (17) hours.

- January 2018 – August 3, 2018:
  - $13 per hour for twenty (20) hours per week; $8.65 per hour for twenty (20) hours per week; and $19.50 per hour for seven (7) or eight (8) hours per hour week; $0 for seven (7) or eight (8) hours.

- August 4, 2018 – December 31, 2018:
  - $13 per hour for twenty (20) hours per week; $10.85 per hour for twenty (20) hours per week; and $19.50 per hour for five (5) hours per hour week; $0 for ten (10) hours.

- January 2019 – March 15, 2020:
  - $15 per hour for twenty (20) hours per week; $12.50 per hour for twenty (20) hours per week; and $22.50 per hour for two (2) hours per hour week; $0 for thirteen (13) hours.

- June 2020 – March 2021:
  - $15 per hour for twenty-four (24) to thirty-six (36) hours per week.

- April 2021 – January 3, 2022:
  - $15 per hour for 50% of all hours worked, and $12.50 for 50% of all hours worked (between 30-40 hours per week).

- January 4, 2022 – April 4, 2022:
  - $15 per hour for all hours worked (between 30-40 hours per week).

Defendants produced handwritten weekly pay records for the time period beginning in April 2018 through March 15, 2020. Those records correlate with the wage statements, which show that the defendants were paying plaintiff for a portion of the week at the regular statutory minimum wage rate, a portion of the week at the reduced tip credit minimum wage rate, and anywhere between two (2) and nine (9) hours of overtime at the full statutory overtime rate of time and one-half. What is likely to be the primary factual dispute is whether the defendants were "shaving" hours and failed to pay plaintiff for seven (7) to nineteen (19) "off the clock" hours per week as alleged by plaintiff.

Based on the above allegations, plaintiff contends that the defendants failed to pay him at the statutory minimum wage rate of $9 per hour in 2016; $11 per hour in 2017; $13 per hour in 2018, and $15 per hour in 2019 through 2021 for each hour worked up to forty (40) each week. Instead, plaintiff contends that he was paid at the reduced tip credit minimum rate for twenty (20) hours each week. However, an employer can pay an employee based on the "tip credit" minimum wage only if certain preconditions are satisfied. It is plaintiff's argument that the defendants were not not entitled to take any "tip credits" under federal or state law because they failed to properly provide plaintiff with a written wage/tip notice, which renders the "tip credit" invalid. *See Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F.Supp.2d 253, at *70 (S.D.N.Y. 2011) (employer must inform the employee that it intends to treat tips as satisfying part of the employer's minimum wage obligations); *Chan v. Sung Yue Tung Corp.*, No 03-6048, 2007 U.S. Dist. LEXIS 7770, at*18 (S.D.N.Y. Feb. 1, 2007); *Hart v. Rick's Cabaret International, Inc.*, 967 F. Supp. 2d 901, 934 (S.D.N.Y. 2013). Without notice, an employer is not entitled to take the tip credit, and "[i]f the penalty for omitting notice appears harsh, it is also true that notice is not difficult for the employer to provide." *Tango's Restaurant*, *supra*, 969 F.2d at 1323.

In addition, because plaintiff worked more than twenty percent (20%) of each shift (and pay period) in non-tipped capacities (which the defendants must acknowledge by their own pay system), plaintiff is entitled to be paid at the full statutory minimum wage rate for all regular hours worked up to forty (40) each week. *See* N.Y. Lab. Law Reg. § 146-2.10.

Plaintiff further alleges that the defendants failed to pay him *any* overtime compensation at the statutory rate of time and one-half for seven (7) to nineteen (19) hours per week (*see, infra*) in direct contravention of federal and state law. Defendants dispute that plaintiff worked any hours "off-the-clock."

Finally, plaintiff alleges that he is entitled to a "spread of hours" premium of one (1) additional hour's pay at the statutory minimum wage rate for each day where his work shift exceeded ten (10) hours. Defendants dispute that plaintiff's work shift ever exceeded ten (10) hours in a single day.

Based on the allegations in the complaint, plaintiff calculates that had he prevailed at trial on *all* of his claims, he would have recovered approximately $78,000 in unpaid minimum wages, overtime compensation, and "spread of hours" premium with an equal amount in liquidated damages. Together with the statutory damages for the defendants' failure to provide wage notices and accurate wage statements, the total value of plaintiff's claims amount to approximately $166,000.[2]

However, as discussed below, we believe this settlement to be a fair resolution to this litigation, due to *bona fide* disputes about the value of plaintiff's claims.

### III.     Defendants' Contested Facts

Plaintiff worked as a dishwasher and delivery worker at 3 Guys from 2012 to January 30, 2022. Throughout his employment, 3 Guys recorded the number of hours that he worked per workweek and paid him on an hourly basis. Plaintiff did not work shifts longer than ten hours per day. He worked as a tipped delivery worker only on some days per workweek. He worked as a dishwasher only on other days in the same workweek. For his hours worked as a delivery employee, the restaurant paid him at the applicable tipped employee minimum wage rate. For his hours worked as a dishwasher, he was paid at the full applicable New York State minimum wage rate. He was paid for overtime hours worked at a rate of one and one-half times the minimum wage rate. When his tips and wages were combined, he was always paid well in excess of the applicable minimum wage rate.

From April 2016 to the end of plaintiff's employment, the relevant period in this Action, plaintiff would sign off on his wages paid and hours worked per workweek, thereby confirming them. The restaurant paid plaintiff's wages and tips on payroll checks, subject to required deductions and withholdings. Plaintiff received weekly paystubs reflecting his gross and net wages, hours worked, payroll deductions, and regular and overtime wage rates. Contrary to his claims, he was always paid for all hours worked per workweek at the correct wage rates.

The restaurant properly took a tip credit against plaintiff's wages. It always posted New York State minimum wage posters explaining, *inter alia*, the tip credit and how it applied to tipped employees' wages. Plaintiff's paystubs also reflected his wages paid and tips earned. That he may or may not have gotten a single piece of paper stating the above is irrelevant to the restaurant's ability to take a tip credit. *See, e.g., Marin v.*

---

[2] Assuming plaintiff could not demonstrate that he worked the additional "off the clock" overtime hours, plaintiff's damages solely for the unpaid minimum wages amount to approximately $13,000 and, together with liquidated and statutory damages, amount to a total of approximately $36,000.

*Apple-Metro, Inc.*, No. 12-cv-5274 (ENV)(CLP), 2020 WL 6157011, at *7–8 (E.D.N.Y. Oct. 21, 2020); *Mongollan v. La Abundancia Bakery & Rest. Inc.*, No. 18 Civ. 3202 (GDB)(SDA), 2021 WL 1226923, at *5–6 (S.D.N.Y. Mar. 31, 2021); *see also Ahmed v. Morgan's Hotel Grp. Mgmt., LLC*, 160 A.D.3d 555, 556 (1st Dep't 2018).

Plaintiff cannot make a claim under NYLL § 195(1). He was hired in 2012 and did not bring this lawsuit until 2021, almost ten years later. The statute of limitations on NYLL claims is six years. N.Y. Lab. L. § 198(3). Plaintiff cannot privately sue for any alleged failures to receive wage notices after his hiring. *See, e.g.*, *Gamero v. Koodo Sushi Corp.*, 272 F. Supp. 3d 481, 510 n. 13 (S.D.N.Y. 2017) (limiting NYLL § 195(1) claims to failures to receive notice upon hiring only). As such, his only possible claim under NYLL § 195(1) for an alleged failure to receive a wage notice at the time of his hiring is time-barred.

Finally, plaintiff ignores the *Mt. Clemens* burden-shifting analysis. *See, e.g.*, *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946). Because the defendants have produced payroll and time records, it is plaintiff who must come forward with evidence rebutting the records and proving his time shaving allegations. *See generally id.* Plaintiff cannot do this, especially because he does not have supporting records, signed off on his weekly hours worked and wages paid for years, and, tellingly, was paid for significant amounts of overtime.

## IV.    Defendants' Alleged Financial Hardship

Defendants cannot withstand a judgment or the expenses of prolonged litigation. For settlement purposes only, the defendants produced financial information proving that the Restaurant has been losing money for years, that the individual defendant has little to no assets, and that the Restaurant has significant outstanding debt. Notably, in the wake of the COVID-19 pandemic, the Restaurant has suffered substantial financial losses and a sharp decrease in business, as plaintiff acknowledges by admitting that his hours were significantly reduced since the start of the pandemic. If this action continues, the defendants would be forced to file for bankruptcy and close their operations.

Although the defendants believe that they have strong defenses and that a jury would ultimately find in their favor, continuing with this action would be economically unfeasible and likely deplete the resources they are using to pay for the settlement. Without admitting liability or wrongdoing to plaintiff or to any of their employees, the defendants have agreed to settle this matter to avoid the expenses of protracted litigation.

## V.    The Agreement is Fair and Reasonable

The parties represent to the Court that the settlement between the parties is a fair and reasonable resolution of a *bona fide* dispute reached as a result of extensive negotiations. In considering whether a settlement is fair and reasonable, the principal question is "whether the agreement reflects a reasonable compromise of disputed issues rather than a mere waiver of statutory rights brought about by an employer's

overreaching." *Le v. SITA Info. Networking Computing USA, Inc*., No. 07 Civ. 86, 2008 U.S. Dist. LEXIS 20786, at *2 (E.D.N.Y. Mar. 13, 2008) (*quoting Lynn's Food Stores*, *supra*, 679 F. 2d at 1354)).

Here, this settlement was reached as a result of extensive arm's length negotiations between counsel who are well versed in the prosecution and defense of wage and hour actions and during a settlement conference before Your Honor. Courts typically regard the adversarial nature of a litigated FLSA case to be an indicator of the fairness of the settlement. *See Aponte v. Comprehensive Health Management, Inc*., No. 10 Civ. 4825, 2013 U.S. Dist. LEXIS 47637 at *9 (S.D.N.Y. Arp. 13, 2013).

As reflected in the attached Agreement, the parties have agreed to settle plaintiff's claims for a total of $40,000.00, which is to be paid over the course of seven (7) monthly installments commencing within thirty (30) days of the Court approving the terms of the Agreement. The financial terms of the Agreement were recommended to the parties by Your Honor.

In light of the various disputes concerning plaintiff's claims, as well the risk of ongoing litigation, this settlement should be approved. By settling now, plaintiff a significant portion of his alleged underlying unpaid wages (and arguably all of his demonstrable unpaid wages) even after attorneys' fees and costs are deducted, while enabling the parties to avoid the risks inherent in any trial. Based on our assessment of litigation risks, which we discussed thoroughly with plaintiff, he made the decision to accept the Court's proposal. It is respectfully submitted that, in view of the foregoing, this settlement is a reasonable compromise of disputed issues and should therefore be approved.

## VI.    Application for Attorneys' Fees

Pursuant to this firm's retainer agreement with plaintiff, our firm seeks retain one-third of the net proceeds of the settlement after expenses are deducted.[3] Therefore, plaintiff's counsel seeks $13,148.34 in fees, plus $551 in costs, for a total fee application of $13,699.34.

Attorneys' fees in FLSA settlements are examined, to ensure that the interests of plaintiff's counsel in his own compensation did not adversely affect the extent of the relief counsel procured for the clients. *See Wolinsky v. Scholastic*, 900 F.Supp.2d 332, 336 (S.D.N.Y. 2012). In this case, plaintiff's counsel fee of one-third is reasonable. Of course, had the case proceeded, assuming plaintiff prevailed, plaintiff's counsel would have made a fee application for much more than the amount currently sought in fees.

While the Second Circuit's ruling in *Cheeks* did not outline the factors for approving a settlement, certain red-flag issues were identified, such as the inclusion of confidentiality provisions, general releases, and attorneys' contingency fees over in excess of 40%. *Id.* at 206. This Agreement contains no such red flags. Moreover, since the *Cheeks* decision, courts routinely hold that a contingency fee award is presumptively valid

---

[3] The firm's expenses total $551 for filing fees ($400), service of process ($151).

where, as here, the proposed fee amount is exactly one-third of the net settlement amount. *See Caceres v. Brentwood Farmers Market*, No. 20 Civ. 3476, 2021 U.S. Dist. LEXIS 147063, at *4-6 (E.D.N.Y. May 4, 2021); *Garcia v. Cloister Apt. Corp.*, 16 Civ. 5542, 2019 U.S. Dist. LEXIS 51887, at *9-10 (S.D.N.Y. Mar. 27, 2019). Here, plaintiff agreed to a one-third contingency retainer agreement with counsel in connection with his wage-and-hour claims.

For all of the reasons set forth above, the parties respectfully request that the Court approve the Agreement and enter the proposed Stipulation and Order of Dismissal, which is being submitted simultaneously herewith, that expressly provides that the Court will retain jurisdiction over this matter solely for purposes of enforcing the Agreement.

Respectfully submitted,

/s/ *Justin Cilenti*
Justin Cilenti

cc: Defense Counsel (by ECF)